**DaVita Inc. v. Bednar**

2

*Stephen G. Harvey, Christopher P. Vanderveer, Noah S. Robbins* and *James J. Byrne,* for plaintiff.

*James H. Steigerwald, Sean S. Zabaneh* and *Andrew J. Reilly,* for defendants.

BURR, *J.,* June 8, 2010—The plaintiff, DaVita Inc., appeals from this court's order granting the cross-motion

of the defendants, Barbara Bednar, Reliant Renal Care Inc., Nola M. McMullen and Stephanie Bates, for sanctions against the plaintiff for its willful violation of two court orders to produce its chief executive officer, Kent Thiry, for his deposition, and dismissing the plaintiff's complaint pursuant to Pa.R.C.P. 4019(c)(3).[1]

The facts giving rise to this action are that the plaintiff, a nationwide multi-billion dollar provider of dialysis and other medical services, purchased Physicians' Dialysis Inc. (PDT), a company owned by the defendant, Barbara Bednar, on September 1, 2004 for approximately $150,000,000. Pursuant to that merger and in exchange for $1,750,000, Ms. Bednar entered into an agreement with the plaintiff setting forth restrictive covenants prohibiting her from "engaging in any business or business activities in competition with [the plaintiff]" for the ensuing three years and, in relevant part, from soliciting the plaintiff's employees to curtail their employment with the plaintiff for the ensuing five years, along with a confidentiality proviso. (Executive non-solicitation and non-competition agreement, appended as exhibit 2 to the defendants' motion for summary judgment, preamble and paragraphs 1 (a), (b) and (c); 2; and 5, pp. 1-4.) This agreement allowed for the plaintiff to seek a remedy for

---

1. "Pa.R.C.P. 4019. Sanctions . . .

"(c) The court, when acting under subdivision (a) of this rule may make . . .

"(3) an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or entering judgment of non pros or by default against the disobedient party or party advising the disobedient party. . . .

"(5) such order as regard to the failure to make discovery as is just." Pa.R.C.P. 4019 (c)(3) and (5).

breach in the form of a restraining order or preliminary injunction to restrain Ms. Bednar from such violation without prejudice as to any other available remedies at law and equity. (*Id.*, paragraph (d), p. 3.) An indemnification provision in the agreement set forth a covenant on the part of Ms. Bednar to indemnify the plaintiff for any losses, liability and expenses, including reasonable attorneys' fees which the plaintiff "may incur as a result of [Ms. Bednar's] breach of this agreement." (*Id.*, paragraph 6, p. 5.)

Ms. Bednar left the plaintiff's employment to form the defendant, Reliant Renal Care Inc. (RRC) and become its president and chief executive officer in the fall of 2007 after her non-competition agreement with the plaintiff had expired. Ms. Bednar later asked the defendants, Nola M. McMullen and Stephanie Bates, also former employees of the plaintiff, to serve as executives of her new company. Ms. McMullen, who became RRC's chief operating officer on December 1, 2007 after leaving DaVita on November 9, 2007, and Ms. Bates, who became RRC's associate director of reimbursement on March 4, 2008 after leaving DaVita on February 25, 2008, had participated in stock option programs during their tenure with the plaintiff. Those programs fell under an overall contract labeled an "equity compensation plan". The preamble, which sets forth the purpose of the stock option plans, states:

"1. *Purpose.* The purpose of the DaVita Inc. 2002 equity compensation plan is to promote the interests of DaVita Inc. (company) and its stockholders by enabling the company to offer an opportunity to acquire an equity interest in the company so as to better attract, retain,

and reward employees, directors, and independent contractors and, accordingly to strengthen the mutuality of interests between those persons and the company's stockholders by providing those persons with a proprietary interest in pursuing the company's long-term growth and financial success. Awards under the plan will be made in the issuance of options, restricted stock, stock issuances, stock appreciation rights, and other awards." (DaVita Inc. 2002 equity compensation plan (as amended and restated effective March 30, 2005), appended as exhibit 5 to the defendants' motion for summary judgment, paragraph 1, p. 1.)

There is no mention in the foregoing "Equity Compensation Plan" that it was provided to any employee in exchange for a covenant not to compete.

However, a 10-year stock option agreement dated March 2, 1998, that was issued to the defendant, Ms. McMullen, by DaVita's predecessor, Total Renal Care Holdings Inc., pursuant to the company's 1997 equity compensation plan, set forth a "non-competition/non solicitation" provision prohibiting the optionee's participation as an employee in a firm within a 500-mile radius that was in the same business as the issuer and soliciting the issuer's employees with offers of employment for a period of one year following termination of his/her employment with the issuer. (1997 non-qualified stock option agreement under the 1997 equity compensation plan of Total Renal Care Holdings Inc., signed by the defendant, Nola McMullen on March 2, 1998, exhibit 6 to defendants' motion for summary judgment, paragraph 7, p. 2.) The within stock option agreement stated that it would terminate 10 years from the date of

the agreement or three months following the termination of the optionee's employment with the issuer, whichever came earlier. (*Id.,* paragraph 3(i) and (ii).)

Two five-year stock option agreements issued pursuant to the company's 1999 equity compensation plan issued by Total Reliant Renal Care Inc. and signed by Ms. McMullen (19,000 and 20,000 shares, respectively) and Ms. Stephanie DiValerio Bates (5,000 and 6,000 shares, respectively), on March 29, 2000 and September 14, 2000, set forth non-competition, non-solicitation and non-disclosure restrictive covenants of one year's duration following termination of the optionee's employment. (Non-qualified stock option agreements under the Total Renal Care Holdings Inc. 1999 non-executive officer and non-director equity compensation plan-employee signed by the defendant, Nola M. McMullen March 29, 2000, and September 14, 2000, appended as exhibits 7 and 8 to the defendants' motion for summary judgment, paragraph 10, p. 4 each; *Id.,* Stephanie DiValerio Bates, exhibits 13 and 14 to defendants' motion for summary judgment.)

A five-year stock appreciation rights agreement under the DaVita Inc., 2002 equity compensation plan-employee granted to Nola M. McMullen on July 1, 2006 also set forth one-year non-competition and non-solicitation restrictive covenants as were found in the stock option agreements signed by Ms. McMullen on March 2, 1998, March 29, 2000 and September 14, 2000. (Stock appreciation rights agreement under the DaVita Inc., 2002 equity compensation plan-employee, appended as exhibit 9 to the defendants' motion for summary judgment, paragraphs 11(a) and (b), unnumbered p. 4.) However,

this stock option agreement alone provided that, if Ms. McMullen breached the non-compete or non-solicitation agreement within one year following the termination of her employment with the plaintiff, the stock option agreement would terminate on the date upon which she entered into such activity and any gain realized "from exercising all or a portion of this SAR shall be paid by the grantee to the company." (*Id.*, paragraph 11(c), unnumbered p. 5.)

Ms. McMullen gave sworn deposition testimony that she exercised her stock options granted by the plaintiff by means of a "cashless exchange" whereby the price at which her stocks were sold were paid to her as taxable income. (8/20/08 McMullen deposition 175-76 appended as exhibit 10 to the defendants' motion for summary judgment.) A stock award exercise statement issued by the plaintiff for the defendant, Ms. McMullen, from January 1, 2000 to July 1, 2006, adduces that she received "taxable compensation" from the plaintiff in the amount of $1,636,722.26 during that period in exchange for exercising her stock options. (Exhibit 11 to the defendants' motion for summary judgment.) The foregoing stock award exercise statement adduces that Ms. McMullen, who resigned from DaVita Inc. on October 9, 2007, never exercised her stock options granted under the 2006 plan that included the forfeiture clause. *(Id.)* The stock award exercise statement from January 1, 2000 to July 1, 2006 issued by the plaintiff for the defendant, Stephanie DiValerio Bates, who left DaVita's employ in February of 2008, indicates that she received "taxable compensation" of $335,691.44 during that period in exchange for exercising her stock options. (Exhibit 15 to the defendants' motion for summary judgment.)

## MOTIONS FOR SUMMARY JUDGMENT

After filing the initial complaint in the above-captioned matter on June 19, 2008, the plaintiff filed a motion for preliminary injunctive relief that was disposed of by an order of the Honorable Edward J. Zetusky Jr. on December 11, 2008. Judge Zetusky granted the plaintiff's injunction petition in part against the defendants, Barbara Bednar and Reliant Renal Care Inc., prohibiting them from further soliciting the plaintiff's employees to work for Reliant Renal Care Inc. Judge Zetusky's granting of only partial injunctive relief was explained in the conclusions of law accompanying his decision on plaintiff's petition for preliminary injunction as having been based on findings that the prayer for relief against the defendant, Nola McMullen, was moot because her one-year non-competition agreement with the plaintiff had expired, and that the plaintiff had not established the elements for injunctive relief against the defendant, Stephanie Bates. (Conclusions of law accompanying Judge Zetusky's decision on plaintiff's petition for preliminary injunction, *DaVita Inc. v. Barbara Bednar,* no. 08-7516, paragraphs 12 and 13, p. 6, appended as exhibit 10 to the plaintiff's exhibits to its memorandum of law in opposition to the defendants' motion for summary judgment and in support of its cross-motion for summary judgment.)

Thereafter, the defendants sought summary judgment to dismiss all of the plaintiff's monetary damages claims on grounds that none of plaintiff's claims for partial breach of the within non-compete and non-solicitation covenants was compensable under the laws of Delaware and Pennsylvania. Defendants further asserted that none of the damages claimed by the plaintiff from the defen-

dants, Ms. McMullen and Ms. Bates, was compensable because there had been no forfeiture clauses in their non-compete agreements, and because the plaintiff had retained the full measure of the defendants' services for which the agreements were made from their many years of considerable service to the plaintiff company. The defendants contended that no attorney fees could be recovered from the defendant, Barbara Bednar, because the indemnification agreement in her restrictive covenant applied only to third-party actions and not to suits filed by the plaintiff against Ms. Bednar. The defendants insisted that no punitive damages were recoverable from the defendants because there was no evidence of outrageous conduct presented by the plaintiff to support them. Finally, the defendants claimed that the doctrine of judicial estoppel barred plaintiff's claims for money damages from the defendants inasmuch as plaintiff admitted at the hearing, pursuant to its injunction petition, that its damages were impossible to calculate. (Defendants' motion for summary judgment, paragraphs 1-18, pp. 1-5, passim.)

The plaintiff filed a cross-motion for summary judgment seeking return of the consideration paid to the defendants, Nola M. McMullen and Stephanie DiValerio Bates, pursuant to the exercise of their stock option agreements on grounds that they had breached those agreements by accepting employment with RRC within one year of leaving DaVita Inc., in violation of the non-competition covenants set forth therein. Having deemed that there existed factual questions surrounding the issues raised in the parties' cross-motions for summary judgment that could be resolved through the course of further

10

discovery, the court denied those motions for summary judgment without prejudice by separately issued orders dated September 21, 2009. Pa.R.C.P. 1035.3(c) ("the court may rule upon the motion for judgment or permit affidavits to be obtained, depositions to be taken or other discovery to be had or make such other order as is just").

The most notable of the outstanding issues germane to this appeal is whether the stock options granted to the defendants, Ms. Mullen and Ms. Bates, were intended by plaintiff to retain and reward employees for their job performance, as indicated by the stated "purpose" for the program, the titles of the documents themselves, *i.e.,* "compensation plan-employee", and the payment of the returns on their sale as taxable income to the defendants, or whether the options were tendered solely in exchange for covenants not to compete with the plaintiff's business. The plaintiff insists that the option agreements themselves unambiguously set forth the parties' intentions that the options were tendered in exchange for one-year covenants not to solicit or compete and that "speculation" and parol evidence are both impermissible and unnecessary to disprove that self-serving opinion. (Memorandum in support of plaintiff's cross-motion for summary judgment, pp. 42-43.) Plaintiff goes one step further in stating the viewpoint that "[c]onsideration of extrinsic evidence as to the intent of the agreements is irrelevant, improper, and has no bearing on the analysis before the court." (*Id.,* p. 43.) A second pertinent issue is whether it was within the contemplation of the parties for a partial return of the consideration paid to the defendant, Barbara Bednar, in exchange for her non-solic-

itation agreement and covenant not to compete to be recoverable in an action for breach of one, but not both, of those covenants?

Of crucial import in determining whether the stock options issued to the defendants, Ms. McMullen and Ms. Bates, were tendered as compensation to retain and reward their job performance or as consideration for covenants not to compete is a "memorandum" co-authored by plaintiff's chief executive officer, Kent Thiry, dated December 19, 2000, and entitled "WOOTM" (way out of the money) options. (Memorandum from Kent Thiry, Joe Mello, Bill Schilling and Rich Whitney, dated December 19, 2000 and appended as exhibit B to the defendant's memorandum of law in further support of their motion for summary judgment.) The contents of that memorandum are recapitulated in relevant part below:

"Everyone in a management position benefits when WOOTM options are turned in, even if they personally do not receive any more options.

"The reason is that options and bonuses are interchangeable forms of extra pay. In other words, every person has an opinion on what an option is worth. . . .

"In general we want to allocate options to the people to whom they are worth the most. When we do that, we pay them lower salaries and bonuses than we would have to without the options. This frees up cash for other people. . . .

"The only way for us to be fair in compensating individuals is to look at all their forms of compensation over multiple years compared to the value of their contribution over those years.

"This means we look at salary, bonuses, and options. In particular, option grants are a form of multi-year compensation, because they vest over four years and start out with no exercise value . . . .

"We cannot change all of this. We hope to build credibility as being fair on compensation issues. To be fair, we must look at each person's total compensation over time, including options. In fact, we want people to know how much we want their income and savings to grow. As a team, turning WOOTM in helps this cause." (*Id.,* unnumbered pp. 2-3.)

## DISCOVERY SANCTION AGAINST THE PLAINTIFF FOR FAILURE TO PRODUCE ITS CEO, KENT THIRY, FOR THE TAKING OF HIS DEPOSITION

The court, on September 10, 2009, granted the defendants' motion to compel production of documents, a corporate designee of plaintiff, and the deposition of the plaintiff's CEO, Kent Thiry, within 10 days of the date thereof, for purposes of questioning him regarding the foregoing memorandum, as well the plaintiff's intentions regarding recoupment of the Bednar consideration for breach of the non-solicitation covenant. The plaintiff filed, on September 24, 2009, or four days following the date upon which it had been ordered to produce Mr. Thiry for his deposition, a motion for reconsideration of that order. The grounds for reconsideration thereof were a recapitulation of the plaintiff's defense to the defendants' motion to compel Mr. Thiry's deposition and were stated by plaintiff as follows: "(1) there is no proper

basis for the deposition of DaVita CEO, Kent Thiry, (2) these issues are more fully developed on the basis of the summary judgment record recently considered by the court, which crystallized the overall contract issues in the case, (3) manifest injustice would result from forcing DaVita to produce its CEO for deposition either because Mr. Thiry would have to neglect other responsibilities or because those other responsibilities would prevent him from being deposed and DaVita could potentially be subject to sanctions as a result, and (4) because defendants can show no substantial prejudice from not taking the deposition of Mr. Thiry." (Plaintiff's motion for reconsideration of the court's order compelling the deposition of Kent Thiry, paragraph 1, pp. 1-2.)

The plaintiff, here again, insisted that the stock option agreements signed by Ms. McMullen and Ms. Bates were whole, entire, utterly unambiguous, and required no further clarification as to their purpose and intent from Mr. Thiry or anyone else. (*Id.,* paragraphs 17 and 21-24, pp. 6-7.) The plaintiff argued that Mr. Thiry was not DaVita's head of human relations nor the direct supervisor of Ms. McMullen and Ms. Bates, and that the September 19, 2009 memorandum, contended to be merely a "corporate philosophy statement" about stock options generally, did not reference the exact stock option agreements they had signed. (*Id.,* paragraph 25, p. 9.) The plaintiff offered to supply a corporate designee, answer an interrogatory, or enter into a stipulation instead of producing Mr. Thiry for a deposition, and complained of the unfairness of being required to produce its CEO simply because he, along with other of the company executives, "may have some knowledge in general about

how and why DaVita uses stock options." (*Id.* paragraph 26, p. 8.)

The plaintiff asserted that the defendants were improperly trying to make Mr. Thiry the plaintiff's corporate designee in violation of Pa.R.C.P. 4007.1(e)("the organization so named shall serve a designation of one or more officers, directors or managing agents or other persons who will testify on its behalf. . . ." (*Id.,* paragraph 27, p. 8.) Plaintiff contended that, if Mr. Thiry were to be deposed in this action, a meeting with counsel to prepare his testimony and the deposition itself would consume much of his valuable time and prevent him from fulfilling his other duties and responsibilities. (*Id.,* paragraph 28, p. 8.) Finally, the plaintiff argued that Mr. Thiry has no knowledge, recollection or memory regarding any ambiguity in the Bednar agreement about the allocation of the $1,750,000 in consideration paid to Bednar in the event of a breach, and that he has no knowledge, recollection or memory of any ambiguity under the McMullen and Bates stock option agreements about the performance required by either of them under the agreements. (*Id.,* paragraph 30, p. 9.) All in all, the plaintiff's refusal to produce Mr. Thiry hinged on three grounds: (1) the Bednar agreement and the stock option agreements signed by Ms. McMullen and Ms. Bates are unambiguous; (2) even if there were an ambiguity in either, Mr. Thiry has no testimony to offer; and (3) any relevant testimony in these matters could be provided by a corporate designee because Mr. Thiry, a high ranking corporate official, is too busy with his personal, charitable and business affairs to afford the time it would take to give his deposition.

Appended as exhibit R to the plaintiff's motion for reconsideration of the order compelling Mr. Thiry's deposition is a copy of a letter from plaintiff's counsel to defendants' counsel sent on or about September 24, 2009 wherein counsel listed the documents plaintiff had produced pursuant to the September 10, 2009 court order. The final paragraph of that letter, which omits in its entirety any mention of the order compelling production of Mr. Thiry for a deposition, is set forth below in its entirety:

"Judge Burr's order also required us to produce corporate designee testimony. As you know, we already produced my partner, Matt Adler, to testify about DaVita's attorneys' fees and costs in this matter. We were prepared to produce DaVita Vice President Dennis Skrajewski last Friday as a corporate designee on topics 5-7 in defendants' supplemental notice of deposition of DaVita Inc., but you indicated that you would prefer to reschedule that deposition. We will produce Mr. Skrajewski as a corporate designee at a mutually acceptable time before trial. Other than the testimony to be provided by Mr. Skrajewski, there are no topics in either of the corporate designee notices of deposition at issue in the defendants' motion to compel as to which DaVita has any additional testimony to provide." *(Id.)*

It is here noted that approximately three months prior to the foregoing letter the court was provided on or about June 15, 2009 with the plaintiff's pretrial conferencing statement stating the claims and significant legal and evidentiary matters that are at issue in the case. Plaintiff's counsel stated in that letter that plaintiff intended to seek a protective order to prevent the taking of Mr. Thiry's

deposition. (Exhibit 16 appended to defendants' motion for summary judgment, p. 3.) Contrary to that expressed intention, plaintiff has never filed a motion for protective order seeking to halt the taking of Mr. Thiry's deposition.

The defendants listed, in their memorandum of law in opposition to plaintiffs' motion for reconsideration of the court's order compelling the deposition of Kent Thiry and cross-motion for sanctions, the following reasons why they wished to take Mr. Thirty's deposition after noting that the plaintiff's motion for reconsideration had been filed after plaintiff had ignored the court's order to produce Mr. Thiry for a deposition.

"(1) Mr. Thiry co-authored an internal memorandum that directly contradicts DaVita's damages claim against McMullen and Bates. Defendants would be severely prejudiced if they do not have the opportunity to present Mr. Thiry's deposition testimony about this key evidence to a jury.

"(2) Mr. Thiry was aware of and involved in DaVita's $150,000,000 acquisition of PDI. Bednar executed her non-competition and non-solicitation agreement as part of that transaction. Mr. Thiry must have knowledge about the transaction, the consideration paid to Bednar, and the allocation of consideration paid to Bednar between Bednar's non-competition, non-solicitation and other covenants.[2]

---

2. Defendants appended as exhibit 5 to their memorandum of law in opposition to plaintiff's motion for reconsideration of the order compelling Kent Thiry's deposition a copy of an internal DaVita e-mail regarding the merger agreement between plaintiff and PDI wherein the draft agreement was said to reflect "the position of Kent Thiry on the indemnification issues." (*Id.,* exhibit 5.)

"(3) DaVita's argument that Mr. Thiry's testimony would be inadmissible according to the parol evidence rule was made and rejected, together with DaVita's cross-motion for summary judgment. In any event, Pa.R.C.P. 4003.1(a) establishes that "[i]t is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

"(4) DaVita states, without providing so much as an affidavit or declaration from Mr. Thiry, that he has no recollection of the events at issue. Further, again without any support, DaVita claims that it would be burdensome for Mr. Thiry to appear for a deposition. These bald claims would permit any witness to avoid a deposition and the courts have rejected such arguments when raised by top executives.

"(5) DaVita has flagrantly disregarded its obligations, the Pennsylvania Rules of Civil Procedure, and this court's order. DaVita failed to produce Mr. Thiry for deposition, DaVita never moved for a protective order or to quash defendants' deposition notice and DaVita ignored the court's order compelling Mr. Thiry's deposition. Remarkably, DaVita's own motion establishes that it had notice of Mr. Thiry's deposition for over two months and counsel for DaVita never even spoke to him about the deposition. It is clear DaVita had no intention of producing Mr. Thiry all along and its stall and delay tactics cannot be permitted . . . ." (*Id.,* pp. 2-3.)

The court held a hearing on October 6, 2009 to consider plaintiff's motion for reconsideration of the order of September 10, 2009. At the hearing, plaintiff's counsel reiterated his written argument that Mr. Thiry was a

18

high ranking executive with no personal knowledge or connection with the facts of this case and could offer no testimony that would lead to discovery of evidence that was admissible at trial. (10/6/09 N.T. 4, 19, 31.) The plaintiff again contended that the Bednar and stock option agreements signed by Ms. McMullen and Ms. Bates were not ambiguous and that the parol evidence rule would prohibit testimony of the intentions of the parties in their regard. (*Id.,* 8-11, 15, 19.) When questioned by the court whether DaVita's failure to allocate damages for breach of the non-compete and non-solicitation covenants in the Bednar agreement created an ambiguity, plaintiff's counsel replied, "there was no allocation whatsoever. That's the answer. . . .[t]he subject never came up." (*Id.,* 10-11.)

Plaintiff's counsel argued that there was no linkage between Mr. Thiry and the instant stock option agreements, that the WOOTM memorandum post-dated their entry and that the subject of the memorandum was stock options in general and not the options entered into by the defendants, Ms. McMullen and Ms. Bates. (*Id.,* 17-18, 29.) Plaintiffs' counsel said DaVita could stipulate that the memorandum was "true" as to its contents, but contended that the defendants should not be able to pick plaintiff's corporate designee, and that plaintiff was willing to choose a corporate designee who is knowledgeable about stock options for them. (*Id.,* 18-19.) In answer to the court's mention that the order of September 10, 2009 ordered the production of a corporate designee and a question as to why one had not yet been produced, plaintiff's counsel replied that he was going to answer that when responding to the defendants' motion for sanctions. (*Id.,* 20.)

When the court asked why the plaintiff had not filed a protective order to prevent the taking of Mr. Thiry's deposition, counsel replied that he had been in for summary judgment motions and a conference with the court twice since the September 10, 2009 order had been issued, and had then filed the within motion for reconsideration. (*Id.,* 20-21.) When the court reminded plaintiff's counsel that the order of September 10, 2009 was still running and had not been stayed, counsel replied, "[y]es, I understand that, your honor," and that he had felt that filing the motion for reconsideration of the order an effective substitute therefor. (*Id.,* 21-22.)

Plaintiff's counsel next argued that it's not proper for parties in a case to force the deposition of a high ranking corporate officer with 33,000 employees and 1500 dialysis clinics, *i.e.,* because Mr. Thiry is a very busy man. (*Id.* 23-24.) The court commented that Mr. Thiry had plenty of backup personnel and electronic equipment at his disposal, and suggested that perhaps, if Mr. Thiry thought his time was too valuable, he might consider settling this case to avoid a burdensome procedure. (*Id.,* 25-26.) When plaintiff's counsel mention that Mr. Thiry's time was being consumed with the planning of Tour DaVita, a charitable bike race, the court remarked that Mr. Thiry's deposition need not be taken during the bike race. (*Id.,* 26-27.)

Defendants' counsel responded to these arguments by stating that plaintiff had requested repeated offers of proof for Mr. Thiry's deposition which were given but never accepted; that plaintiff has never filed for a protective order; nor provided an affidavit or declaration showing why the taking of Mr. Thiry's deposition would be

unreasonable and burdensome or designed to harass or that it was being made for an improper purpose. (*Id.,* 32-34.) Defendants' counsel seized on plaintiff's counsel's statement in his argument—that he didn't know whether Mr. Thiry had participated in discussions about the buyout of the Bednar agreement—as proof that the deposition was necessary. (*Id.,* 30, 33.) Defendants' counsel insisted that how Mr. Thiry would divide and value that agreement is very important, admissible and reasonably calculated to lead to the discovery of admissible evidence. (*Id.,* 33.) Defendants' counsel said that he and his co-counsel had tried to work this out for months before moving to compel Mr. Thiry's deposition before the September 10, 2009 order was issued, and that afterward, they had asked plaintiff's counsel three times for dates and three times were told, "we'll get back to you." (*Id.,* 33-34.)

Plaintiff's counsel responded that he had not thumbed his nose at the court's order, resting his laurels on the production of 23,000 pages of documents in response thereto, and asserted that defendants' counsel should have accepted without question his assertion that Mr. Thiry had no personal knowledge of the matters at issue in this case. (*Id.,* 47-49.) Plaintiff's counsel alleged that defendants' counsel was attempting to use the taking of Mr. Thiry's deposition as leverage to settle the case, a motive plaintiff's counsel deemed "improper". (*Id,* 50.) When asked by the court how much time would be necessary for the scheduling and prepping of Mr. Thiry for a deposition, plaintiff's counsel balked when the talk reached two weeks, but never indicated that he would refuse to follow any such order, were it to be issued. (*Id.,* 52-54.) Nor did plaintiff's counsel register an objection

when the court said it would issue an order by the end of the day mandating the taking of Mr. Thiry's deposition within 14 days. (*Id.,* 58.) That order read as follows:

## "ORDER

"And now, October 6, 2009, upon consideration of plaintiff's, DaVita Inc., motion for reconsideration of the court's order dated September 10, 2009, compelling the deposition of Kent J. Thiry, and defendants' answer in opposition thereto, as well as the memoranda of law submitted in support thereof, and oral argument having been heard thereon, it is hereby ordered and decreed that said motion will be, and hereby is, denied.

"It is further ordered and decreed that plaintiff shall produce Kent Thiry for deposition in Media, Pennsylvania within 14 days from the date of this order or risk dismissal of all plaintiff's claims in this matter with prejudice.

"By the court:

_____

"Charles B. Burr, II   J."

The court thereafter, received the following letter from plaintiff's counsel mailed on or about October 13, 2009, advising the court as follows:

"Dear Judge Burr:

"I am writing to respectfully advise your honor that plaintiff DaVita Inc. believes your honor's orders of September 10 and October 6, 2009, compelling the deposition of DaVita chief executive officer, Kent J. Thiry and declining to reconsider that decision, respectively, are in error. Under the circumstances, DaVita has de-

cided that it will not comply with the court's order to produce Mr. Thiry for a deposition. We fully expect that defendants will renew their request for sanctions and that the parties will need to brief the subject of an appropriate sanction, without waiver of DaVita's position that no sanction is appropriate.

"Respectfully submitted,

"Stephen G. Harvey" (Exhibit C to supplement to the defendants' cross-motion for sanctions.)

In response to this letter, defendants' counsel then filed a supplement to their motion for sanctions seeking dismissal of the plaintiff's case. The following order was issued:

"ORDER

"And now, October 26, 2009, counsel for the plaintiff having notified the court in writing of his client's intention to violate willfully this court's order of October 6, 2009, which denied the plaintiff's motion for reconsideration of the previously violated September 10, 2009 court order that plaintiff produce, within 10 days thereof, its chief executive officer, Kent Thiry, for a deposition,[3]

---

3. It is here noted for the record that the plaintiff neither objected to the order of September 10, 2009, nor filed a motion for a protective order to prevent Mr. Thiry's deposition from being taken. In fact, plaintiff's counsel reassured defense counsel during that period that they would contact defense counsel regarding the making of those arrangements. When asked by the court why no objection to Mr. Thiry's deposition was timely raised, plaintiff's counsel advised the court that they were spending the time preparing the above-cited motion for reconsideration. Nevertheless, the plaintiff's motion for reconsideration was not filed until four days following the deadline for the taking of Mr. Thiry's deposition.

and ordered the plaintiff to produce Mr. Thiry for a deposition within 14 days thereof or risk dismissal of all of the plaintiff's claims with prejudice pursuant to Pa.R.C.P. 4019(c)(3), it is hereby ordered and decreed that oral argument on the defendant's cross-motion for sanctions for plaintiff's violation of the September 10, 2009 order and to discuss appropriate sanctions for the plaintiff's violation of the October 6, 2009 order will be held in courtroom 7 in the Delaware County·Courthouse at 9:30 a.m. on Wednesday, October 28, 2009.

"By the court:

_____

"Charles B. Burr, II   J."

The defendants' counsel argued at the hearing on their supplemental motion for sanctions that it was unprecedented, in his and his colleagues' view, for a party to write to a judge to say they were going to violate an order with which they disagreed. (10/28/09 N.T. 4.) Defendants' counsel noted that plaintiff had violated two court orders compelling the deposition of Kent Thiry, despite being specifically warned in the second order that to do so risked dismissal of Mr. Thiry's lawsuit. *(Id.)* Defendants' counsel said that Pa.R.C.P. 4019(c)(3)(set forth in footnote 1, *supra*) specifically allows dismissal, as well as the catch all Rule 4019(c)(5) *(id.),* and that prejudice to the moving party is not a prerequisite therefor. (10/28/09 N.T. 6.) Nevertheless, the defense pleaded prejudice from the potential not to be able to present evidence to a jury that a memorandum co-authored by the plaintiff's CEO, Kent Thiry, directly contradicts the plaintiff's theory of damages against the defendants, Ms, McMullen and Ms. Bates. *(Id.,* 7.) Counsel for the de-

24

fendants further argued that Kent Thiry's knowledge of negotiations for the buyout of the Bednar agreement would give them testimony currently lacking on the subject of the damages plaintiff is seeking. (*Id.*, 8.)

Counsel for the plaintiff argued that the court could not dismiss this case in the absence of a finding of prejudice to the defendants from an inability to take Kent Thiry's deposition, even where the violation of the order in question is willful. (*Id.*, 11-12.) Plaintiff's counsel asserted that the testimony sought must be determinative of the entire controversy. (*Id.*, 13.) Plaintiff's counsel said that it took a month or so after the deposition was noticed to reach Mr. Thiry to question him as to his knowledge regarding the Bednar buyout, and thus he could not compile a motion for protective order to prevent Mr. Thiry's having to be deposed by the defendants. (*Id.* 14-20.) Nevertheless, a motion for protective order has never been filed by the plaintiff even after that conversation took place. Plaintiff's counsel again asserted that Mr. Thiry knew nothing about the specific stock option agreements issued to Ms. McMullen and Ms. Bates, nor about any valuation issues regarding the Bednar restrictive covenants and for a buyout that had been contemplated some two years after the merger between DaVita and PDI in 2004. (*Id.* 36-43.) Plaintiff's counsel said the appropriate sanction for his willful violations of the court's orders should be limited to total preclusion of any testimony regarding the allocation issues surrounding the Bednar agreement. (*Id.* 44.) Plaintiff's counsel also asserted a claim for attorneys' fees on grounds that his willful violation of the court's orders had been substantially justified under the law. (*Id.*, 45.)

Defendants' counsel argued that it was essential to question Mr. Thiry as to whether the 2000 memo applied to the stock options issued to Ms. McMullen and to Ms. Bates and that it is a critical issue in the case hinging on whether the options were issued as compensation or, as the plaintiff claims, were solely in exchange for covenants not to compete. (*Id.* 47-48.) Following the hearing on the defendants' supplemental motion for sanctions, the following order was issued by the court:

"ORDER

"And now, October 28, 2009, upon consideration of defendants' cross-motion for sanctions, and plaintiff's response thereto, as well as the memoranda of law submitted in support thereof, and oral argument having been heard thereon, it is hereby ordered and decreed that said cross-motion will be, and hereby is, granted, and all of plaintiff's claims in the above-captioned action will be, and hereby are, dismissed with prejudice pursuant to Rule 4019(c)(3) of the Pennsylvania Rules of Civil Procedure because the violation of two court orders by plaintiff, DaVita Inc., by willfully refusing to produce its chief executive officer, Kent Thiry, for his deposition, is prejudicial to the defendants.

"By the court:

_____

"Charles B. Burr, II    J."

The plaintiff filed a timely notice of appeal from that order has submitted the following statement of errors complained of on appeal:

"(1) The court erred in imposing the most severe sanction possible: dismissal of the action with prejudice for

DaVita's violation of a discovery order requiring the deposition of DaVita's chief executive officer, Kent J. Thiry. The court imposed this sanction without a demonstration of prejudice to defendants, without consideration of the less drastic alternatives that would more appropriately "fit the crime," and without assessing the marginal value of Mr. Thiry's potential testimony which, based on the record, did not go to the heart of the controversy and could only provide impermissible parol evidence about unambiguous contract language. The sanction was thus overly broad and not tailored to fit the violation. Further, the court erred by not properly considering whether any prejudice caused by the defendants' inability to depose Mr. Thiry could have been cured.

"(2) The court erred in dismissing the case with prejudice pursuant to Pa.R.C.P. 4019(c)(3) because Rule 4019(c)(3) does not authorize a court to dismiss a case with prejudice as a discovery sanction. The rule permits the court only to enter 'an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or entering a judgement of non pros or by default against the disobedient party or party advising the disobedience.'

"(3) The court erred in ordering, then failing to reconsider, the deposition of DaVita's CEO Kent J. Thiry despite defendants' failure to meet the heightened standard required before a court may compel a deposition of a high corporate officer. The court did not find and could not have found Mr. Thiry possessed relevant and admissible evidence, let alone testimony that went to the heart of the controversy. Further, the court erred by not considering that defendants' request for Mr. Thiry's deposi-

tion was done with the apparent intention of harassing and burdening DaVita, not to seek relevant or admissible evidence which a corporate designee could have easily provided. The court also erred by not considering that any prejudice could have been cured because, among other things, DaVita offered to stipulate to the contents of the December 2000 memorandum defendants relied on in pursuing Mr. Thiry's deposition, meaning even if the December 2000 memorandum were relevant and admissible evidence not subject to the parol evidence rule, the defendants could not have been prejudiced by their inability to depose Mr. Thiry. Finally, the court erred to the extent it improperly issued the order compelling Mr. Thiry's deposition as a leverage point for settlement negotiations." (Plaintiff, DaVita Inc.'s, statement of errors complained of on appeal, pp. 1-3.)

## THE "MOST EXTREME" SANCTION

The plaintiff claims that the court erred in dismissing its ease with prejudice as a discovery sanction for DaVita's admittedly willful violation of a discovery order [sic] requiring the deposition of DaVita's chief executive officer, Kent J. Thiry. (Concise statement, paragraph 1.) The plaintiff alleges that the court imposed this sanction without a demonstration of prejudice to defendants, without consideration of the less drastic alternatives that would more appropriately "fit the crime," and without assessing the marginal value of Mr. Thiry's potential testimony which, based on the record, did not go to the heart of the controversy and could only provide impermissible parol evidence about unambiguous contract language. *(Id.)* In plaintiff's view, the sanction was thus overly broad and not tailored to fit the violation.

*(Id.)* Further, according to the plaintiff, the court erred by not properly considering whether any prejudice caused by the defendants' inability to depose Mr. Thiry could have been cured. *(Id.)*

The Pennsyvania Rules of Civil Procedure permit discovery regarding any matter, not privileged, which is relevant to the subject matter in pending litigation, so long as it does not involve trial preparation materials and expert opinion preparation materials. Pa.R.C.P. 4003.1 and 4003.5. Pa.R.C.P. 4011 provides in relevant part that "no discovery or deposition shall be allowed that: (a) is sought in bad faith; (b) would cause unreasonable annoyance, embarrassment, oppression, burden or expense to the deponent or any person or party; (c) is beyond the scope of discovery as set forth in Rules 4003.1 through 4003.6, or . . . (e) would require the making of an unreasonable investigation by the deponent of any party or witness." *(Id.)* Pa.R.C.P. 4012 allows for the court to enter an order prohibiting a deposition in order to protect a party or person from unreasonable annoyance, embarrassment, oppression, burden or expense. And, as noted in footnote 1, *supra,* the court may issue an order entering a judgment of non pros or striking the pleadings or by default against a disobedient party or any other order with regard to the failure to make discovery as is just. Pa.R.C.P. 4019(c)(3) and (5).

The plaintiff's conduct through this entire episode of defendants' seeking to obtain discovery of its CEO, Kent Thiry, had been obstreperous, uncooperative, dilatory and downright wanton. The plaintiff's stall tactics to avoid the taking of the Thiry deposition are replete in the record. Plaintiff could have sought a protective order

when the defendants' noticed Mr. Thiry's deposition; indeed, it had advised the court as early as June of 2009 of the intent to seek one. Yet, plaintiff did not do so for no apparent reason other than counsel's alleged inability to contact Mr. Thiry by telephone or by any other reasonable means to ask his client whether he knew anything about the subject matter of the deposition. However, inability to contact the client is not a ground available to the plaintiff to prevent that deposition from being taken. Plaintiff has never asserted that Mr. Thiry's deposition was being sought in bad faith, or that it would cause *unreasonable* annoyance, embarrassment, oppression, burden or expense to the deponent or any person or party. Plaintiff's only recourse was to show that the information being sought was beyond the scope of allowable discovery under the applicable rules.

Nevertheless, the rules allow for discovery of any matter, not privileged, unless it involves attorney trial preparation materials, and expert testimony preparation materials. Contending that one's client does not recall or remember the matters about which discovery is sought raises a necessary implication that there is some knowledge of those matters that could be retrieved by careful and probing questioning. The defendants have shown time and again that Mr. Thiry's testimony would be relevant to the purpose of the stock option agreements granted to Ms. McMullen and Ms. Bates, and the valuation of Bednar's restrictive covenants. The defendants exercised great patience and forebearance of plaintiff's many excuses why he could not confirm whether his client would be available for a deposition. It was only after hearing one too many times "I'll get back to you" that defendants' filed their motion to compel Mr. Thiry's

deposition which was granted by the court on September 10, 2009. The plaintiff was given 10 days to produce Mr. Thiry, but did not do so, nor did it file a motion for protective order.

To add insult to injury, the plaintiff had the temerity to file a motion for reconsideration of that order some three days after the deadline for producing Mr. Thiry had passed with the excuse that it had been busy producing documents to the defendants and filing the reconsideration motion instead of one seeking a protective order. After being ordered to produce Mr. Thiry within two weeks following a hearing on the motion, the court received a letter dated October 13, 2009 from plaintiff's counsel advising that DaVita planned to violate any order that required it to produce Mr. Thiry. At this juncture, in order to vindicate the authority of the court, the necessity to impose the "ultimate" sanction became mandatory. The record fully adduced that plaintiff was not only seeking to prevent the defendants from making the best possible ease for their clients, it was willfully undermining its ability and the necessity to prove its own.

Dismissal of a party's claims with prejudice is permissible under Pa.R.C.P. 4019(c) where the party willfully violates a discovery order following consideration of the following factors: (1) the prejudice caused to the opposing party; (2) the defaulting party's willfulness; (3) the number of discovery violations committed by the party; and (4) the importance of the precluded evidence in light of that failure. *Hein v. Hein,* 717 A.2d 1053, 1056 (Pa. Super. 1998). Each of the foregoing factors is merely a necessary consideration and not a prerequisite for imposing the ultimate sanction. *Croydon Plastics Co. v.*

*Lower Bucks Cooling & Heating,* 698 A.2d 625, 629 (Pa. Super. 1997). The lack of a showing of actual prejudice to the opposing party need not be controlling in a decision to dismiss a case as a discovery sanction, nor is there a need for a showing that violation of a court order is willful. *Sahutsky v. Myehak, Geckle & Welker P.C.,* 900 A.2d 866, 869-70 (Pa. Super. 2006).

The court found that the defendants have repeatedly been prejudiced by the plaintiff's repeated refusal to produce Mr. Thiry, including the willful violations of this court's orders to do so. Mr. Thiry's statements about the stock option plans being intended to compensate the company's employees directly contradict the plaintiff's claim that they were issued solely in exchange for the restrictive covenants in issue. Mr. Thiry's testimony regarding the respective allocation of values to the restrictive covenants agreed to by Ms. Bednar will impact her liability for violation of the non-solicitation agreement that was enjoined by Judge Zetusky. Both issues are central to the defendants' ability to litigate their case. The plaintiff disingenuously raises a distinction between the term "dismissal with prejudice" and those used in Rule 4019(c). Nevertheless, the phrase "striking out pleadings" renders these purported distinctions to be without merit. Plaintiffs cannot say they did not receive unambiguous and frequent warning that the ultimate sanction was possible if they violated the orders to produce Mr. Thiry. In determining that they would violate an order that gave notice of possible dismissal, the plaintiff sealed its fate.

The remaining litany of plaintiff's excuses for dilatory, wanton, egregious and willful conduct toward both

32

the defendants and this court (concise statement, paragraphs 2 and 3) are too specious, incredible and irrelevant to warrant any further discussion and may be cogently summarized as follows: "plaintiff, through its unacceptable conduct has reached into the court's quiver of sanctions, drawn the bowstring taut and aimed the arrow at the heart of its own ease. This court has justifiably released the string."[4]

For all of the foregoing reasons, and given the prolonged tautology of this case, there is no doubt that the "punishment" imposed by the court—to dismiss the plaintiff's claims with prejudice—was an appropriate discovery sanction which "fit the crime", and ought not to be disturbed on appeal.

---

4. Miami-Dade Circuit Judge Scott Silverman's rueful assertion when he ordered a mistrial and dismissed the corporate plaintiff's case after learning that its trial witness had been texting to the company's CEO while the judge and counsel were conferring at sidebar. (*The Legal Intelliencer,* August 17, 2009, p. 4.)